# EXHIBIT 2

FILED IN DENVER
DISTRICT COURT
DENVER, COLORADO

20 DEC 18 PM 12: 25

DATE FILED: December 18, 2020
CASE NUMBER: 2020CV583

CARL A. WESCOTT
MOVENPICK APARTMENTS/HOTEL #509
BUR DUBAI, 19TH STREET, OUD METHA
ACROSS AMERICAN HOSPITAL
DUBAI, UAE (UNITED ARAB EMIRATES)
*in propria persona*
CARLWSOJ@GMAIL.COM
+971 4 336 6000

# DISTRICT COURT OF THE STATE OF COLORADO

# IN AND FOR DENVER COUNTY

CARL A. WESCOTT,

              Plaintiff,

    vs.

GLOBAL ACCELERATOR
   NETWORK, LLC;
PATRICK RILEY;
LIZZIE CROUGH;

             Defendants.

+ DOES 1 through 50

Civil Action No. — 20CV583 – 269

**PLAINTIFF'S COMPLAINT FOR BREACH OF CONTRACT, PROMISSORY FRAUD; PROMISSORY ESTOPPEL; NEGLIGENT MISREPRESENTATION; NEGLIGENT INTERFERENCE WITH ECONOMIC ADVANTAGE; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; and BLACKBALLING (VIOLATIONS OF COLORADO REVISED STATUTES §§8-2-110 TO 8-2-114)**

JURY TRIAL REQUESTED

    Plaintiff Carl A. Wescott, proceeding *pro se,* complains of Defendants Global Accelerator Network, LLC ("GAN"), Mr. Patrick Riley, and Ms. Lizzie Crough, and in support of his Complaint, the Plaintiff states as follows:

    **PLAINTIFF'S COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; PROMISSORY ESTOPPEL; NEGLIGENT MISREPRESENTATION; NEGLIGENT INTERFERENCE WITH ECONOMIC ADVANTAGE; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; and BLACKBALLING (VIOLATIONS OF COLORADO REVISED STATUTES §§8-2-110 TO 114)**

1

20CV583-01

**PARTIES**

1. The Plaintiff is currently a resident of Scottsdale, Arizona, with an office in Dubai, UAE (United Arab Emirates).

2. Global Accelerator Network, LLC ("GAN") is an organization that brings together some of the top accelerator funds in the world. As GAN puts it on its web page, those accelerator funds are "mentorship-driven with terms-favorable-to-entrepreneurs". GAN accelerators provide startups with the resources necessary to create and grow businesses, wherever they are. GAN has dozens of employees, and its headquarters are at 1031 33rd Street, Suite 231, in Denver. GAN has been operating in Colorado since 2010 as a subsidiary of Techstars (originally), and as an independently-owned entity since 2014. However, the named Colorado LLC was not formed until 10/30/2019, almost eight years after the operating history of Global Accelerator Network, LLC (January 2012) in Colorado.

3. Mr. Patrick Riley is the CEO of GAN (and also is its registered agent for service of process).

4. Ms. Lizzie Crough is a full-time employee of GAN and its Community Manager.

**Jurisdiction and Venue**

5. Jurisdiction is appropriate in this Court as GAN has its headquarters office in Denver, Colorado and this Court can assert general *in personam* jurisdiction over GAN. Defendants Patrick Riley and Lizzie Crough are both residents of Colorado and work in Denver, and thus this Court can assert personal jurisdiction over the two individual defendants as well.

**Further allegations regarding DOES and conspiracy between defendants**

6.  Upon information and belief, there are even more individual Defendants currently unknown to Plaintiff, who shall emerge with the benefit of legal discovery.

7.  Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, Mr. Riley and Ms. Crough, as individuals, in addition to acting for themselves individually, as well as for the benefit of their respective marital community (if any per individual case), are and were acting as the agents, servants, employees, and/or representatives of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendants (individual and entities) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

8.  Plaintiff further alleges on information and belief that the acts of each of the individual Defendants were fully ratified by each and all of the Defendants. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

9.  In addition, upon information and belief, there are even more corporate, trust, and other entity type Defendants currently unknown to Plaintiff, which shall emerge with the benefit of legal discovery.

10. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, GAN, in addition to acting for itself and for its own behalf, was acting as the agent, servant, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy

1    with each and all of the Defendants (entity and individual) and within the course, scope, and

2    authority of that agency, service, employment, representation, and conspiracy.

3    11. Plaintiff further alleges on information and belief that the acts of each of the entity Defendants

4    were fully ratified by each and all the Defendants.  Specifically, and without limitation, Plaintiff

5    alleges on information and belief that the tortious actions, failures to act, breaches, and

6    negligence alleged herein and attributed to one or more of the specific Defendants were

7    approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy

8    with all other Defendants (individual and corporate).

**Underlying Facts – Background on Defendant GAN and accelerator funds**

12. Defendant Global Accelerator Network, LLC ("GAN") is an organization that brings together

some of the top accelerator funds in the world.  As GAN puts it on its website, those accelerator

funds are "mentorship-driven with terms-favorable-to-entrepreneurs".  GAN accelerators

provide startups with the resources necessary to create and grow businesses, wherever they are.

More information is available at https://www.gan.co/.  (Exhibit A, Sworn Affidavit of Carl

Wescott)

13. GAN has dozens of employees, and its headquarters are at 1031 33rd Street, Suite 231, in

Denver.  GAN has been operating in Colorado since 2010 as a subsidiary of Techstars

(originally), and as an independently-owned entity since 2014.  However, the Colorado LLC

was not formed until 10/30/2019, almost eight years after the operating history of Global

Accelerator Network, LLC in Colorado.

4

14. Upon information and belief, Defendant GAN is a subsidiary to Global Accelerator Network, LLC, a Delaware entity formed on January 18th, 2012 (file number 5096763).  (Exhibit A)

15. Upon information and belief, GAN may have delayed the creation of the Colorado LLC subsidiary to the Delaware LLC (also named Global Accelerator Network) for almost eight years to avoid and evade certain Colorado state taxes.  If so, then Mr. Riley and other GAN officers/management could be guilty of conspiracy to commit one or more forms of felony tax fraud.  The Plaintiff will serve discovery to confirm this theory, and if confirmed, will then do his duty as a citizen and report to the Colorado Department of Revenue, the IRS, and law enforcement.

16. Accelerator funds are a type of venture capital fund, with a slightly different model.  Venture capital funds are more hands-off and often later-stage than most accelerator funds and invest almost all their raised capital in companies (minus management fees).  (Exhibit A, Sworn Affidavit of Carl Wescott)

17. Accelerator funds, like Y Combinator (                    ), get involved with startups at an earlier stage than most venture capital investments.  Most accelerator funds invest smaller amounts than venture capital funds per startup (US $30,000 to US $100,000 is a typical investment), at a lower valuation (accelerators often get 6% to 10% of a startup or more), but the accelerator funds invest a lot of time and expertise along with their capital to help guide the startups so they can grow their business and raise further needed capital.  (Exhibit A, Sworn Affidavit of Carl Wescott)

18. Accelerator funds typically group their investments into classes, or cohorts, that they then assist for three to five intensive months, culminating in a Demo Day where each startup in the cohort does a presentation for investors.  (Exhibit A)

19. The accelerator fund model, when properly executed, has been demonstrated to yield high returns and to generate significant equity in funds and their portfolio companies.  (Exhibit A)

20. Based on the success of Y Combinator, Tech Stars, 500 Startups, Venture Catalysts, Startup Boot Camp, and other accelerators, there are now thousands of accelerator funds worldwide. (Exhibit A)

21. Though GAN involves the entire venture and startup communities, it has over 100 accelerator fund members, including the SparkLabs Group (www.sparklabsgroup.com).  Those accelerator funds member pay US $15,000 a year to GAN to be more involved, to get GAN's guidance as well as access to resources including proprietary data that GAN collects on accelerators worldwide.  (Exhibit A)

22. India Accelerator is another GAN member that is relevant to this legal complaint.  India Accelerator (www.indiaaccelerator.co) is based, as the name might imply, in India.  (Exhibit A)

**Underlying Facts – SparkLabs Group and SparkLabs IoT**

23. Plaintiff is a former employee of the SparkLabs Group, and prior to that and in parallel, a mentor at some of the SparkLabs accelerator funds for its portfolio companies.  (Exhibit A, Sworn Affidavit of Carl Wescott)

24. From SparkLabs' inception in 2012 through October 26th, 2017, the Plaintiff was a mentor at SparkLabs Seoul (funded for those time periods by Korea Fund I and Korea Fund II, two SparkLabs funds), and other SparkLabs accelerators. (Exhibit A)

25. In August 2017, Mr. Bernard Moon, founding partner of the SparkLabs Group, offered the Plaintiff a job at the SparkLabs Group, specifically to be the Managing Director and fund manager of SparkLabs IoT and Smart City accelerator fund ("SparkLabs IoT") (web site was at www.sparklabsiot.com. The 2019 web site can be viewed at http://web.archive.org/web/20190324090549/http://www.sparklabsiot.com/en/index.php). (Exhibit A)

26. According to Mr. Moon, in private communications with the Plaintiff, as well as many statements broadcast to the public (such as here https://hackernoon.com/sparklabs-group-a-new-beginning-cf1e49c7afe7), SparkLabs IoT had raised enough money to fund sixteen (16) investments in IoT companies in its first batch. (Exhibit A)

27. At the link above, Mr. Moon falsely claims that SparkLabs IoT invested $50,000 in Drop (https://getdrop.com/) – it was actually Korea Fund II that wired those monies, and Drop is a Korea Fund II portfolio company.

28. The SparkLabs IoT website, in 2019, viewable today at the link above, still claims to have those sixteen (16) companies in its portfolio.

29. According to Mr. Moon and other SparkLabs partners and stakeholders in private communications, SparkLabs IoT was to receive about US $1 million a year in grants from the South Korean government. (Exhibit A)

30. The Plaintiff accepted the job offer and began full-time work at his new job on October 26th, 2017. (Exhibit A)

31. However, by December 2017, the Plaintiff discovered and figured out that something was amiss at the SparkLabs Group. More specifically, the Plaintiff discovered that all the statements that Mr. Moon had made to him and the general public about SparkLabs IoT having already raised money and made those 16 investments were lies. (Exhibit A)

32. With former South Korean President Park Geun-hye impeached and removed from office (soon to be sentenced to 24 years in prison for corruption, on April 6th, 2018), it did not appear that the grant money President Park had promised would still be coming in. (Exhibit A)

33. SparkLabs IoT had essentially no money and could not pay the Plaintiff's salary. (Exhibit A)

34. SparkLabs IoT had borrowed over US $700,000 from Korea Fund, II ("KF II"), another SparkLabs accelerator fund, to make the sixteen (16) investments in SparkLabs IoT companies. (Exhibit A)

35. While SparkLabs IoT had the stock in those startups, Korea Fund II had made all of the wires to the companies. (Exhibit A)

36. Undisclosed, unapproved inter-fund loans are prohibited by the federal and state securities laws of the United States. (Exhibit A)

37. False statements (related to securities offerings) made to investors and prospective investors are also illegal and prohibited by the federal and state securities laws of the United States. (Exhibit A)

38. Finally, false statements (related to securities offerings) made to the general public are also illegal and prohibited by the federal and state securities laws of the United States. (Exhibit A)

8

39. Thus, for SparkLabs IoT alone, there were multiple types of securities fraud that the Plaintiff discovered at SparkLabs.  (Exhibit A)

40. In early 2018, to protect SparkLabs investors, the Plaintiff insisted that these issues be cleaned up as best as possible.  As part of that, the discrepancy between Korea Fund II (that had made the SparkLabs IoT investments) and SparkLabs IoT (that owned shares in 16 portfolio companies but had not paid for them) would need to be fixed.  (Exhibit A)

41. SparkLabs partners Bernard Moon, Jimmy Kim, and Eugene Kim, most active in these discussions, agreed with the Plaintiff that the above issues would be cleaned up.  (SparkLabs partners Hanjoo Kim, Frank Meehan, and Jay McCarthy were copied on emails and were aware of these issues but were less-active participants in these discussions).  (Exhibit A)

42. As the second phase of cleanup, the Plaintiff also insisted on a new clean fund to be set up (not tainted by securities fraud), full disclosure to investors, the SEC, the public, and other necessary stakeholders.  The Plaintiff suggested that a new law firm be retained to further investigate and advise on what needed to be done, and to coordinate those activities until complete.  (Exhibit A)

43. In 2018, the Plaintiff worked with Eugene Kim, Jimmy Kim, and others to inform the sixteen (16) portfolio companies what had happened, and to move/correct issued shares, investor agreements, and capitalization tables to reflect that Korea Fund II had made the 16 IoT company investments, and not SparkLabs IoT.  (Exhibit A)

44. Because there was not much for the Plaintiff to do in his original expected job as the Managing Director of SparkLabs IoT (as there was no money to invest, due to the securities fraud issues), the Plaintiff was instead requested to do many more things to help many other SparkLabs accelerators and dozens of portfolio companies.  (Exhibit A)

9

45. Among other tasks, the Plaintiff helped portfolio companies market and sell, helped founders get their visas, wrote up investment documents, did outreach to various communities, attended many events and conferences on behalf of SparkLabs (including GAN events), sourced deal flow, and evaluated investment opportunities. (Exhibit A)

46. However, in early March 2019, in a brief phone call, Bernard Moon informed the Plaintiff that SparkLabs was not going to shut down the current tainted SparkLabs IoT fund, was not going to start a new clean fund, and was not going to retain a new law firm nor disclose what had happened. (Phone records will show the exact date of that phone call). (Exhibit A)

47. In response, in that same phone call, the Plaintiff then threatened to whistleblow and tip off the SEC and law enforcement as to the securities fraud. Mr. Moon hung up the call. Upon information and belief, at that point, Mr. Moon decided to fire the Plaintiff in retaliation for insisting that the securities fraud be cleaned up, and in retaliation for threatening to tip off and whistleblow the SparkLabs securities fraud issues to the SEC and to law enforcement. (Exhibit A)

48. In another phone call with Mr. Moon in approximately May 2019 (phone records will show the exact date and time), when Mr. Moon was briefly in Ireland on a business trip, Mr. Moon referred to what the Plaintiff had done as a "dirty trick", and told the Plaintiff:

- That he (Bernard Moon) would ensure that the Plaintiff would be erased from all SparkLabs records as it the Plaintiff did not exist (the Plaintiff still does not understand that threat).

- That Mr. Moon and the SparkLabs Group would terminate all personal and professional relationships with the Plaintiff.

- That Mr. Moon and the SparkLabs Group would do everything they could to ensure that the Plaintiff could not work in venture capital, with accelerator funds, and with startups ever again.

- That Mr. Moon and the SparkLabs Group would do everything they could to ensure that the Plaintiff could never make money again.

- That Mr. Moon and the SparkLabs Group would do everything they could to discredit the Plaintiff and ruin his career.  (Exhibit A)

49. On June 20th, 2019, Mr. Moon emailed the Plaintiff firing him from his full-time job at the SparkLabs Group.  The Plaintiff's salary remains unpaid.  (Exhibit A)

**Underlying Facts – GAN events including the Momentum Tour in 2019**

50. The Plaintiff attended multiple GAN events while he was a mentor and then Venture Partner at SparkLabs, including in 2016 and 2017.  The GAN events the Plaintiff attended in San Francisco in 2017, for example, had over 100 participants not only from GAN member accelerator funds, but many other people as participants.  The majority of the participants were not Managing Directors nor Program Managers of GAN member accelerator funds.  (Exhibit A, Sworn Affidavit of Carl Wescott)

51. The Plaintiff also participated in a GAN event in Colorado in 2018 when he was Managing Director of SparkLabs IoT.  Over 100 participants came, the majority of whom were not Managing Directors or Program Managers of GAN member accelerator funds.  (Exhibit A)

52. In December 2018, the Plaintiff attended GAN events in Seoul, South Korea, with a much smaller set of participants – perhaps 20 or 25 people were involved.  At that point, the Plaintiff was considering leaving the SparkLabs Group due to the securities fraud issues.  (Exhibit A)

53. At those December 2018 GAN events, the Plaintiff met Mr. Ashish Bhatia and Ms. Mona Singh of India Accelerator.  Mr. Bhatia and Ms. Singh requested that the Plaintiff get involved with India Accelerator as a mentor and more, making multiple suggestions for how the Plaintiff could get involved.  (Exhibit A)

54. However, at that point, the Plaintiff was concerned that since SparkLabs (already in many other Asian countries) could decide to enter the Indian market, that India Accelerator may be competitive to SparkLabs.  (Exhibit A)

55. The Plaintiff declined the various offers, but let Mr. Bhatia and Ms. Singh know that if and when he left the SparkLabs Group, that he would be in touch about becoming a partner at India Accelerator or a consultant to India Accelerator.  (Exhibit A)

56. Nevertheless, it is relevant for this complaint that in attending one GAN event (with perhaps one-sixth of the number of normal attendees) after beginning to consider new opportunities, but not actively seeking opportunities, that the Plaintiff had multiple offers for consulting.  (Exhibit A)

57. In Spring 2019, GAN had emailed the Plaintiff about five GAN events (collectively, the Momentum Tour), occurring later in 2019 in Pittsburgh (September 2019 for four days beginning September 9th, 2019); Lima, Peru (beginning September 23rd, 2019); Hamburg, Germany (beginning October 7th, 2019); Manama, Bahrain (beginning October 21st, 2019), and Hong Kong (November 2019).  (Exhibit A)

58. The Plaintiff registered for the last four stops of the Momentum Tour, planning to invest a week of time (including the four days of GAN events) at each stop. (Exhibit A)

59. GAN confirmed the Plaintiff's registration for all four days of events at each of those four stops of the Momentum Tour in Peru, Germany, Bahrain, and Hong Kong. (Exhibit A)

60. The Plaintiff then blocked out his calendar for those four weeks and purchased plane tickets to the events. (Exhibit A)

61. After receiving Mr. Moon's email that fired the Plaintiff on June 21st, 2019 (sent the day before), in July 2019 the Plaintiff got in touch with Mr. Bhatia and Ms. Singh of the India Accelerator, and they immediately requested that the Plaintiff join the India Accelerator not only as a mentor but in a significant role. (Exhibit A)

62. (The Plaintiff ultimately agreed to contracts with India Accelerator ("IA") in which IA agreed to pay him US $20,000 to draft some investment-related documents, and then to compensate the Plaintiff for a further US $1.1 million for services rendered related to a new India Accelerator fund – US $1.12 million in total compensation). (Exhibit A)

63. In July 2019 (on July 21st, 2019), the Plaintiff emailed Ms. Lizzie Crough at GAN, letting her know that he was no longer with SparkLabs, and wishing to move his conference registration email from his SparkLabs email to a personal gmail account. (Exhibit A; Exhibit B, email chain including July 21st, 2019 email to Ms. Crough).

64. On September 19th, 2019 (just before the Plaintiff was about to fly to Lima, Peru) Ms. Crough emailed the Plaintiff uninviting him from three of the four days in Peru. Ms. Crough simultaneously made it clear the Plaintiff was not welcome for the main GAN events in Germany, Bahrain, and Hong Kong. (Exhibit A; Exhibit B).

13

65. The Plaintiff found Ms. Crough's reason odd:  that only Managing Directors and Program

Managers for accelerators were welcome for those three of the four days.  (Exhibit A)

66. The reason the Plaintiff found that odd is that he had attended past GAN events as a mentor, not

having such a title.  Further, in all the big multi-day GAN events that the Plaintiff had attended,

the majority of the attendees at the events were not Managing Directors or Program Managers at

accelerator funds.  (Exhibit A).

67. GAN and Mr. Riley wrote about the true purpose of the events and the different types of

attendees (Exhibit C).

68. Upon further information and belief, Ms. Crough and Mr. Riley, on behalf of GAN, decided to

discriminate against the Plaintiff and disinvite him, and Ms. Crough's lies in her email were

there to cover up the real reason for GAN's tortious action.  (Exhibit A).

69. In doing so, the Defendants violated many state and federal laws, including Title VII of the

Civil Rights Act of 1964 (*42 U.S.C. 2000e* and following), and Colorado statutes making it

illegal for employers to have unfair or discriminatory practices (such *as CO Rev Stat § 24-34-

402 (2016))*.  (Exhibit A).

70. The Plaintiff pointed out that Ms. Crough and GAN were discriminating against him (Exhibit

D), but Defendants did not change their course of action, preferring to harm the Defendant to

the maximum extent possible.

71. The Plaintiff wonders what particular reason Ms. Crough, Mr. Riley, and GAN decided to

discriminate against the Plaintiff, and will serve discovery to obtain the evidence for the reason

the defendants decided to violate the Plaintiff's civil rights.

14

72. Is it the Plaintiff's race, color, religion, sex, gender identity, sexual orientation, national origin, age, perceived disabilities, or perceived genetics? (Exhibit A)

73. (The Plaintiff notes that he is not pregnant 😊).

74. There are dozens of federal and Colorado state laws outlawing discriminatory and unfair practices. Once the Plaintiff has received back the results of discovery, the Plaintiff will seek to amend his complaint with more specifics of the particular federal and state laws the Defendants have violated. (Exhibit A).

75. In doing so, the Plaintiff will also amend with specificity as to the particular civil rights that have been violated.

76. In the alternative, but not mutually exclusive to the Plaintiff's theory of discrimination, and upon information and belief, Mr. Moon and other partners or employees at the SparkLabs Group carried out Mr. Moon's May 2019 threat to blackball the Plaintiff, doing everything they could to ensure that the Plaintiff could not make money to support himself or his children, nor work in venture capital, with accelerator funds, and with startups ever again. (Exhibit A).

77. In that theory, Mr. Moon and others at SparkLabs conspired with Mr. Riley, Ms. Crough, and GAN, to disinvite him from GAN events for the purpose of blackballing him from the venture and accelerator community, and attempting to prevent him from having an income, in violation of Colorado Revised Statutes §§8-2-110 to 8-2-114. (Exhibit A).

78. Continuing on with that theory, upon information and belief, Ms. Crough and Mr. Riley also conspired with Mr. Moon and SparkLabs to retaliate against the Plaintiff for threatening the whistleblow the criminal securities fraud he discovered. (The Plaintiff did report to the SEC, DBO, Attorney General, and law enforcement). (Exhibit A).

15

79. In doing so, Ms. Crough and Mr. Riley also violated federal and state laws that prohibit retaliation against whistleblowers.  The state-level law that they violated is *Colorado Revised Statutes Section 24-114-102*.  (Exhibit A).

80. If the Plaintiff confirms the theory that Defendants helped Mr. Moon and the SparkLabs Group carry out their further retaliation for the Plaintiff's threatened and actual whistleblowing to the SEC, the DBO, the Attorney General, and law enforcement, he will seek to amend, adding further causes of action to this legal complaint.

81. For whatever reason Mr. Riley and Ms. Crough decided to try to hurt and damage the Plaintiff with their tortious acts, GAN is legally responsible.  (Exhibit A).

82. GAN is civilly responsible and liable for the tortious acts and non-acts committed by Mr. Patrick Riley and Ms. Lizzie Crough, its employees, in the course and scope of their employment, both under vicarious liability and *respondeat superior*.  (Exhibit A).

83. The principles and doctrines of vicarious liability and *respondeat superior* have been a staple of Colorado law for over a century, like every other state in the United States.  (Exhibit A).

84. That resulting damages to the Plaintiff are quite significant.  (Exhibit A).

85. On the smaller side, the Plaintiff is out thousands of dollars he invested in plane tickets to travel internationally to the GAN events he had been accepted to, as well as some of his time. (Exhibit A)

86. Now, the Plaintiff is forced to invest even more of his time to litigate to prevent the Defendants from hurting others, and to get a judgment for the damages that Defendants have caused him. (Exhibit A)

87. The much larger financial damages come in the form of lost revenue to the Plaintiff. The
Plaintiff, having been an entrepreneur with multiple exits, having helped grow dozens of rocket-
ship startups, and having started companies in fourteen (14) different countries and having
launched products and marketed and sold them all over the world, has some unique skills and
experiences that GAN accelerator funds and their portfolio companies would find valuable.
(Exhibit A)

88. The Plaintiff, having raised, with his teams, over US $550 million of capital, would likely have
signed up multiple other GAN accelerator funds (and possibly some startups) as clients and,
among other potential projects, raised millions of dollars for them, and potentially tens of
millions. That would have been good for the Plaintiff, for those accelerators, for their portfolio
companies, and for GAN itself. (Exhibit A)

89. The Plaintiff has further valuable skills, having been involved with over 16 different accelerator
funds, including the SparkLabs Group, with close to a decade of experience with such
accelerator funds. The SparkLabs Group, in particular, despite its securities fraud, has had
incredible investment returns that have been the highest outside of the United States for at least
four consecutive years, out of more than two thousand (2000) such accelerators. (Exhibit A)

90. The Plaintiff thus knows how to run an extremely successful accelerator fund, when the great
majority of accelerator funds have comparatively terrible results. (Exhibit A)

91. If the Plaintiff booked over US $1.1 million of compensation from attending one small set of
events with one-sixth of the normal attendings, the Plaintiff believes that it is highly likely that
he could have signed up multiple consulting clients from attending the twelve days of events he
was disinvited to. (Exhibit A)

92. The Plaintiff may have become a partner at another GAN accelerator fund, and/or could very well have earned millions in consulting compensation, but for the tortious acts, non-acts, and negligence of the Defendants. (Exhibit A).

93. To right the scales of justice, the Plaintiff is forced to take this step to gather relevant evidence and to get to a jury trial in 2022 or 2023 where he will prove the culpability of the defendants as well as the corresponding damages. (Exhibit A).

94. In the jury trial, a realistic and reasonable number for consequential damages stemming from the Defendants' acts and non-acts shall also be proven. (Exhibit A).


**Count I – Breach of Contract**


95. The Plaintiff realleges paragraphs 1-94 as if fully set out herein.

96. The Plaintiff had formed multiple contracts with GAN, in which the Plaintiff would be attending GAN events in Peru, Germany, Bahrain, and Hong Kong.

97. More specifically, GAN had offered for the Plaintiff to attend, and the Plaintiff had accepted those offers, as further confirmed by GAN personnel.

98. Just before the Plaintiff was to fly to Peru to attend the first of the international scheduled GAN events, Ms. Lizzie Crough, on behalf of Defendants, breached the explicit and implied contracts by disinviting the Plaintiff.

99. In doing so, Ms. Crough, on behalf of Defendants, also repudiated the explicit and implied contracts.

100.     The Plaintiff has been damaged by Defendants breaches and repudiation, losing the monies invested on plane tickets, as well as the value of a significant amount of his time (*quantum merit*).

101.     Most importantly, the Plaintiff has been further damaged by the loss of potentially millions of dollars in consulting revenue and/or partnership with GAN accelerator funds, and/or consulting or job opportunities at startups in those countries.

102.     The Plaintiff will prove his actual lost cash, his lost time and its value (*quantum merit*) at trial.

103.     The Plaintiff will also prove at jury trial what a reasonable expectancy for the earnings he would have made is, if not for Defendants' tortious and negligent acts and non-acts.

104.     The Plaintiff further posits (and will prove at trial) that he has been further damaged to the same amount of base damages by the loss of that revenue and income.


**Count II – Promissory Fraud**


105.     The Plaintiff realleges paragraphs 1-94 as if fully set out herein.

106.     GAN, through its employees, agents, and representatives, made explicit promises and representations (GAN's Assurances) to the Plaintiff, that he would be able to attend the GAN events he had registered for, as confirmed by GAN.

107.     GAN, through its employees, agents, and representatives, made implied promises to the Plaintiff (further GAN Assurances), that GAN would not disinvite him just before the events.

108.    GAN and its co-Defendants Ms. Crough and Mr. Riley intended that the Plaintiff rely on

GAN's representations, explicit promises, and implied promises.

109.    The Plaintiff did in fact reasonably rely on GAN's representations, explicit promises, and

implied promises.

110.    GAN and co-Defendants never intended to follow through on their promises; their

representations were false.

111.    At trial, and partially based on evidence gathered during discovery, the Plaintiff expects to

prove beyond a reasonable doubt that GAN's representations and promises were, indeed, false.

112.    Indeed, the Plaintiff *did* rely on those representations and promises.

113.    The Plaintiff was damaged by his reliance on Riley's and Crough's representations and false

promises, with the loss of monies paid for plane tickets and of his time (quantum merit).

114.    The Plaintiff was further damaged in many ways.

115.    By way of one example, knowing that with his unique skills and experiences, that the

Plaintiff is extremely valuable to the top accelerator funds in the world (GAN members and

customers), the Plaintiff, after being fired from SparkLabs, planned to market himself at the

GAN events.

116.    He therefore did not invest significant amounts of his time and money in other potentially

inferior opportunities.

117.    The Plaintiff was damaged by his reliance on Riley's and Crough's representations and false

promises, with the loss of other opportunities he may have sourced for himself between July and

September 2019, and the loss of opportunities he could fulfill while engaged in litigation with

Defendants for the next 2 or 3 years or more.

118.    Most importantly, the Plaintiff has been further damaged by the loss of potentially millions of dollars in consulting revenue and/or partnership with GAN accelerator funds, and/or consulting or job opportunities at startups in those countries.

119.    The Plaintiff will prove his actual lost cash, his lost time and its value (*quantum merit*) at trial.

120.    The Plaintiff will also prove at jury trial what a reasonable expectancy is for the earnings he would have made, if not for his reliance on Defendants' false promises and representations.

## Count III – Promissory Estoppel

121.    The Plaintiff realleges paragraphs 1-94 as if fully set out herein.

122.    In making GAN's Assurances, GAN and its agents and employees knew or should have known that GAN's Assurances would induce reliance on the part of the Plaintiff, including both action and forbearance.

123.    GAN's Assurances did in fact induce action and forbearance on the part of the Plaintiff.

124.    The interests of justice require that GAN and co-Defendants compensate the Plaintiff for the detriment caused by his reliance and that Defendants be estopped from contending that GAN's Assurances were and are not enforceable.

125.    The Plaintiff has suffered detriment as the result of his reliance on GAN's Assurances, by losing the value of the expenses incurred and in and suffering consequential damages within the contemplation of the parties including business opportunity costs and personal tolls and sacrifices.

**Count IV – Negligent Misrepresentation**

126.    The Plaintiff realleges paragraphs 1-94 as if fully set out herein.

127.    At the time GAN and its agents made their promises and representations ("the GAN Assurances and GAN Representations"), GAN agents and employees were acting in their professional capacity and had a related pecuniary interest.

128.    GAN and its agents and employees failed to exercise due care in making the Riley Representations.

129.    The Plaintiff justifiably relied on the GAN Assurances.

130.    The Plaintiff justifiably relied on the GAN Representations.

131.    The Plaintiff was injured by GAN's agents' lack of due care in making the GAN Assurances and the GAN Representations, in an amount to be proven at trial.

**Count V - Intentional Interference with Contract**

132.    The Plaintiff realleges paragraphs 1-94 as if fully set out herein.

133.    At all relevant times, the Plaintiff was in an economically advantageous relationship with GAN ("the Relationship") that was likely to confer substantial benefits.

134.    At all relevant times, the Plaintiff was highly likely to enter into further economically advantageous relationships with GAN accelerators and their portfolio companies and some GAN event attendees ("the future Relationships") that were likely to confer substantial benefits.

135.    Mr. Riley and Ms. Crough, at least, were aware of the Relationship and the future Relationships both generally and specifically.

136.    Mr. Riley and Ms. Crough, at least, should have been aware of all important aspects of the Relationship and the future Relationships both generally and specifically.

137.    The Defendants acts significantly burdened the Relationship and prevented the future Relationships that would have been formed (and still could have been formed in the future in 2021 and beyond).

138.    Riley's and Crough's acts and non-acts foreseeably and substantially interfered with and disrupted the Relationship and have prevented the future Relationships that would have been formed (and still could have been formed in the future in 2021 and beyond).

139.    The Plaintiff was harmed by Riley's and Crough's intentional acts of interference with the Relationship and the future Relationships by the lost cash, lost time (*quantum merit*) and consequential loss of revenue and compensation, in an amount to be proven at trial.

**Count VI Negligent Interference with Economic Advantage**

140.    The Plaintiff realleges paragraphs 1-94 as if fully set out herein.

141.    At all relevant times, the Plaintiff was in an economically advantageous relationship with GAN ("the Relationship") that was likely to confer substantial benefits.

142.    At all relevant times, the Plaintiff was highly likely to enter into further economically advantageous relationships with GAN accelerators and their portfolio companies and some GAN event attendees ("the future Relationships") that were likely to confer substantial benefits.

23

143.    Mr. Riley and Ms. Crough, at least, were aware of the Relationship and the future Relationships both generally and specifically.

144.    Riley and Crough knew that the Relationship and the future Relationships would be disrupted if they failed to act with due care.

145.    Indeed, Riley's and Crough's lack of due care did disrupt the Relationship and the future Relationships.

146.    Riley's and Crough's acts, non-acts, and negligence foreseeably and substantially disrupted the Relationship and the future Relationships.

147.    Riley's and Crough's lack of due care foreseeably and substantially disrupted the Relationship and the future Relationships.

148.    The Plaintiff was harmed by Riley's and Crough's acts of negligent interference with the Relationship and the future Relationships by the lost cash, lost time (*quantum merit*) and consequential loss of revenue and compensation, in an amount to be proven at trial.

### Count VII – Breach of the Covenant of Good Faith & Fair Dealing

149.    The Plaintiff realleges paragraphs 1-94 as if fully set out herein.

150.    The Plaintiff performed all conditions required of him.

151.    Riley and Crough interfered with the Plaintiff's right to receive the benefits of the contracts and related to his attendance at the scheduled GAN events.

152.    As a direct and proximate result of Riley's and Crough's breach of the covenant of good

faith and fair dealing, implied in law in every contract, the Plaintiff has lost cash, time (*quantum*

*merit*), and significant compensation and revenue, in an amount to be proven at trial.

**Count VIII – Blackballing (Violations of Colorado Revised Stat. §§8-2-110 to 8-2-114)**

153.    The Plaintiff realleges paragraphs 1-94 as if fully set out herein.

154.    Defendants conspired with Mr. Moon and SparkLabs to blackball the Plaintiff, by

attempting to prevent him from earning an income or having opportunities in the world of

venture capital, accelerator funds, and startups.

155.    In the alternative, Defendants' acts, non-acts, and negligence resulted in Mr. Moon's

threatened and desired blackballing of the Plaintiff, by succeeding in to preventing him from

earning an income or having opportunities from attendees at the scheduled GAN events, in late

2019 and for years to come.

156.    The Plaintiff has been damaged by Defendants' acts, non-acts, and negligence, losing the

monies invested on plane tickets, as well as the value of a significant amount of his time

(*quantum merit*).

157.    Plaintiff has been further damaged by the loss of potentially millions of dollars in consulting

revenue and/or partnership with GAN accelerator funds, and/or consulting or job opportunities

at startups in those countries.

158.    The Plaintiff will prove his actual lost cash and the value of his lost time (*quantum merit*)

at trial, as well as a reasonable expectation of income he would have earned in 2019, 2020,

2021, and the years to come were it not for Defendants' blackballing in violation of Colorado law.

WHEREFORE, Plaintiff prays

    (a) As to Count I for all direct and consequential damages the Plaintiff incurred as a proximate result of the Defendants' breaches of contract;

    (b) As to Count II for all direct and consequential damages the Plaintiff incurred as a proximate result of GAN agents' promissory fraud along with the imposition of exemplary damages to deter the Defendants from committing such acts of fraud in the future;

    (c) As to Count III for all direct and consequential damages flowing from GAN agents' inducing detrimental reliamce.

    (d) As to Count IV for all direct and consequential damages the Plaintiff incurred as a proximate result of GAN and its agents' negligent misrepresentations along with the imposition of exemplary damages to deter Defendants from committing or sanctioning such acts of fraud in the future.

    (e) As to Count V for an award of damages sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' intentional interference with the Plaintiff's contracts and possible contracts.

    (f) As to Count VI for an award of damages sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' negligent interference with the Plaintiff's business relations and economic advantages.

(g) As to Count VII for an award of damages, in an amount sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' breach of the covenant of good faith and fair dealing and for the imposition of exemplary damages in an amount sufficient to punish and deter the Defendants from engaging in acts of bad faith in the future.

(h) As to Count VII for an award of damages, in an amount sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' blackballing of the Plaintiff and conspiracy to blackball, in violation of Colorado law. The Plaintiff respectfully requests exemplary damages in an amount sufficient to punish and deter the Defendants from engaging in acts of bad faith in the future.

(i) For his costs of suit and trial, for future attorney fees, and for a reasonable value for his time in representing himself until the Plaintiff can afford to bring in an attorney

(j) For such other and further relief as the Court deems just.

RESPECTFULLY SUBMITTED on Friday December 18th, 2020

CARL A. WESCOTT, *pro se*

1  CARL A. WESCOTT
   MOVENPICK APARTMENTS/HOTEL #509
2  BUR DUBAI, 19TH STREET, OUD METHA
   ACROSS AMERICAN HOSPITAL
3  DUBAI, UAE (UNITED ARAB EMIRATES)
   *in propria persona*
4  CARLWSOJ@GMAIL.COM
   +971 4 336 6000
5

DATE FILED: December 18, 2020
CASE NUMBER: 2020CV583

6
7              **DISTRICT COURT OF THE STATE OF COLORADO**
8                  **IN AND FOR DENVER COUNTY**

9   CARL A. WESCOTT,                    EXHIBIT A:  SWORN AFFIDAVIT
10                                      OF CARL WESCOTT
              Plaintiff,
11
12         vs.
13  GLOBAL ACCELERATOR
       NETWORK, LLC;
14  PATRICK RILEY;
    LIZZIE CROUGH;
15
16            Defendants.
17   + DOES 1 through 50
18

19        I, Carl Wescott, hereby swear under penalty of perjury of the laws of Colorado and of the

20  United States of America, that the following facts are true, to the best of my memory, recollection,

21

22  and belief:

23  1.  I am 53 years old, and a resident of Scottsdale, Arizona, but I currently work mostly in Dubai

24      (UAE).

25

26

                                                                                1
             EXHIBIT A:  SWORN AFFIDAVIT OF CARL WESCOTT

2. I am competent to testify. Were I to be called to testify in this matter, my testimony would be as follows, and until that point, my written testimony is as such:

3. First, I hereby verify everything in my legal complaint as being true.

4. Global Accelerator Network, LLC ("GAN") is an organization that brings together some of the top accelerator funds in the world. As GAN puts it on its web page, those accelerator funds are "mentorship-driven with terms-favorable-to-entrepreneurs". GAN accelerators provide startups with the resources necessary to create and grow businesses, wherever they are.

5. GAN has dozens of employees (per LinkedIn), and its headquarters are at 1031 33rd Street, Suite 231, in Denver.

6. GAN has been operating in Colorado since 2010 as a subsidiary of Techstars (originally), and as an independently-owned entity since 2014.

7. However, as far as I can tell with the records of the Colorado Secretary of State, the Colorado LLC was not formed until 10/30/2019, almost eight years after the Delaware Global Accelerator Network, LLC was formed (January 2018).

8. This was also apparently almost eight years GAN had been operating in Colorado.

9. Mr. Patrick Riley is the CEO of GAN (and also its registered agent for service of process).

10. Ms. Lizzie Crough is a full-time employee of GAN and its Community Manager.

11. I am not an attorney, but from my understanding of jurisdiction, jurisdiction is appropriate in this Court as GAN has its headquarters office in Denver, Colorado and this Court can assert general *in personam* jurisdiction over GAN.

12. Furthermore, Defendants Patrick Riley and Lizzie Crough are both residents of Colorado and work in Denver, and thus I believe this Court can assert jurisdiction over the two initial individual defendants as well.

13. I believe through the discovery process that I will be able to identify quite a few more individual defendants and corporate defendants that are guilty of conspiring with Mr. Riley, Ms. Crough, and GAN to discriminate against me and harm me in many ways, including by blackballing me.

14. If Bernard Moon and others carried out their May 2019 threats against me to try to ensure I would never make money again (in retaliation for insisting that SparkLabs clean up its securities fraud issues and in retaliation for my threat to whistleblow to the SEC and law enforcement), then some of those further defendants will be various SparkLabs partners as well as various SparkLabs funds.

15. GAN's Colorado LLC was not formed until 10/30/2019, almost eight years after identifiable operating history of Global Accelerator Network, LLC in Colorado.

16. I believe that Defendant GAN is a subsidiary to Global Accelerator Network, LLC, a Delaware entity formed on January 18th, 2012 (file number 5096763).

17. I couldn't find another relevant GAN entity in Colorado, and thus, I believe that Pat Riley and possibly other GAN executives delayed filing the Colorado entity for reasons of tax evasion. Upon information and belief, Mr. Riley wished to avoid paying the taxes that would be necessary for Colorado for an LLC operating in Colorado.  I fully admit that is an as-yet-unproven theory, but given that Mr. Riley is apparently in favor of discrimination, blackballing, securities fraud and other crimes that he and his co-conspirators have committed, it would not surprise me if Mr. Riley is attempting to evade taxes for GAN and more.

18. Switching gears to background information and context, accelerator funds are a type of venture capital fund, with a slightly different model.

19. Venture capital funds are more hands-off and often later-stage than most accelerator funds and invest almost all the capital that they raise in companies (minus management fees).

20. Accelerator funds are a type of venture capital fund, with a slightly different model. Venture capital funds are more hands-off and often later-stage than most accelerator funds and invest almost all of the capital that they raise in companies (minus management fees).

21. Accelerator funds, like Y Combinator, get involved with startups at an earlier stage than most venture capital investments. Most accelerator funds invest smaller amounts than venture capital funds per startup (US $30,000 to US $100,000 is a typical investment), at a lower valuation (accelerators often get 6% to 10% of a startup or more), but the accelerator funds invest a lot of time and expertise along with their capital to help guide the startups so they can grow their business and raise further needed capital.

22. Accelerator funds typically group their investments into classes, or cohorts, that they then assist for three to five intensive months, culminating in a Demo Day where each startup in the cohort does a presentation for investors.

23. The accelerator fund model, when properly executed, has been demonstrated to yield high returns and to generate significant equity in funds and their portfolio companies.

24. Based on the success of Y Combinator, Tech Stars, 500 Startups, Venture Catalysts, Startup Boot Camp, and other accelerators, there are now thousands of accelerator funds worldwide.

25. Though GAN involves the entire venture and startup communities, it has over 100 accelerator fund members, including the SparkLabs Group (www.sparklabsgroup.com), that pay US

4

$15,000 a year to GAN to be more involved, and to get GAN's guidance as well as proprietary data that GAN collects on accelerators worldwide.

26. India Accelerator is another GAN member that is relevant to this legal complaint. India Accelerator (www.indiaaccelerator.co) is based, as the name might imply, in India.

27. I was a former employee of the SparkLabs Group, and prior to that and in parallel, a mentor at some of the SparkLabs accelerator funds, for its portfolio companies.

28. From SparkLabs' inception in 2012 through October 26th, 2017, I was a mentor at SparkLabs Seoul (funded by Korea Fund I and Korea Fund II, two SparkLabs funds), and other SparkLabs accelerators.

29. In August 2017, Mr. Bernard Moon, founding partner of the SparkLabs Group, offered me a job at the SparkLabs Group, specifically to be the Managing Director and fund manager of SparkLabs IoT and Smart City accelerator fund ("SparkLabs IoT") (www.sparklabsiot.com).

30. According to Bernard Moon, in private communications with me, as well as many statements broadcast to the public (such as here https://hackernoon.com/sparklabs-group-a-new-beginning-cf1e49c7afe7), SparkLabs IoT had raised enough money to fund sixteen (16) investments in IoT companies in its first batch.

31. According to Bernard Moon and other SparkLabs partners and stakeholders in private communications, SparkLabs IoT was to receive about US $1 million a year in grants from the South Korean government.

32. I accepted the job offer and began work at my new full-time job on October 26th, 2017.

33. However, by December 2017 I figured out that something was amiss at the SparkLabs Group. More specifically, I discovered that all the statements that Mr. Moon had made to me and the

general public about SparkLabs IoT having already raised money and having made those 16 investments were lies.

34. With former South Korean President Park Geun-hye impeached and removed from office (soon to be sentenced to 24 years in prison for corruption, on April 6th, 2018), it did not appear that the grant money President Park had promised would still be coming in, either.

35. SparkLabs IoT had essentially no money and could not pay my salary.

36. The budget I had been promised was also non-existent… there was no money to fund the things I was supposed to do in my job.

37. SparkLabs IoT had borrowed over US $700,000 from Korea Fund, II ("KF II"), another SparkLabs accelerator fund, to make the sixteen (16) investments in SparkLabs IoT companies.

38. While SparkLabs IoT had the equity and shares in those startups, Korea Fund II had made all of the wires to the companies.

39. Undisclosed, unapproved inter-fund loans are prohibited by the federal and state securities laws of the United States.

40. False statements (related to securities offerings) made to investors and prospective investors are also illegal and prohibited by the federal and state securities laws of the United States.

41. Finally, false statements (related to securities offerings) made to the general public are also illegal and prohibited by the federal and state securities laws of the United States.

42. Thus, for SparkLabs IoT alone, there were multiple types of securities fraud that I discovered at SparkLabs.

43. I later found securities fraud in at least seven other SparkLabs funds, but those details are not relevant to this legal complaint.

6

44. In late 2017 and early 2018, for the protection of SparkLabs investors, I insisted that these issues be cleaned up as best as possible.

45. I refuse to participate in illegal activities.

46. I continued to insist on these steps through Spring 2019.  (By Spring 2019 it was clear that I was being pushed out of the SparkLabs Group and my opinion was no longer relevant)

47. For the first phase of cleanup, the discrepancy between Korea Fund II (that had made the SparkLabs IoT investments) and SparkLabs IoT (that owned shares in 16 portfolio companies but had not paid for them) would need to be fixed.

48. SparkLabs partners Bernard Moon, Jimmy Kim, and Eugene Kim, most active in these discussions, initially agreed with me that the above issues would be cleaned up.  (SparkLabs partners Hanjoo Kim, Frank Meehan, and Jay McCarthy were copied on emails and were aware of these issues but were less-active participants in these discussions).

49. As the second phase of cleanup, I also insisted on a new clean fund to be set up (not tainted by securities fraud), full disclosure to investors, the SEC, the public, and other necessary stakeholders, and suggested that a new law firm be retained to further investigate and advise on what needed to be done, and to coordinate those activities until complete.

50. In 2018, I worked with Eugene Kim, Jimmy Kim, and others in the finance/accounting department to inform the sixteen (16) portfolio companies what had happened, and to move/correct issued shares, investor agreements, and capitalization tables to reflect that Korea Fund II had made the 16 IoT company investments, and not SparkLabs IoT.

51. Because there was not much for me to do in my originally expected job as the Managing Director of SparkLabs IoT (as there was no money to invest, due to the securities fraud issues), I

7

was directed to work on other projects, mostly for other accelerator funds or their portfolio companies.

52. Among other tasks, I helped portfolio companies market and sell, helped founders get their United States work and residency visas, wrote up investment documents, recruited mentors and partners to SparkLabs, did outreach to various communities, attended many events and conferences on behalf of SparkLabs (including GAN events), sourced deal flow, and evaluated investment opportunities.

53. I also came up with a program for speedscaling portfolio companies (aka Blitzscaling), which the SparkLabs Group has adopted.

54. However, in early March 2019, in a brief phone call, Bernard Moon informed me that SparkLabs was not going to shut down the current tainted SparkLabs IoT fund, was not going to start a new clean fund, and was not going to retain a new law firm nor disclose what had happened. (Phone records will show the exact date of that phone call).

55. In that same phone call, I then threatened to whistleblow and tip off the SEC and law enforcement as to the securities fraud. Mr. Moon hung up the call.

56. I believe it was at that point in early March 2019 that Mr. Moon decided to fire me in retaliation for insisting that the securities fraud be cleaned up, and in retaliation for threatening to tip off and whistleblow the SparkLabs securities fraud issues to the SEC and to law enforcement.

57. In another phone call with Mr. Moon in approximately May 2019 (phone records will show the exact date and time), when Mr. Moon was briefly in Ireland on a business trip, Mr. Moon referred to what I had done as a "dirty trick", and told the Plaintiff:

8

- That he (Bernard Moon) would ensure that I would be erased from all SparkLabs records as it I did not exist (I still do not fully understand that threat).

- That Mr. Moon and the SparkLabs Group would terminate all personal and professional relationships with me.

- That Mr. Moon and the SparkLabs Group would do everything they could to ensure that I could not work in venture capital, with accelerator funds, and with startups ever again.

- That Mr. Moon and the SparkLabs Group would do everything they could to ensure that the I could never make money or have an income again.

- That Mr. Moon and the SparkLabs Group would do everything they could to discredit me and ruin my career.  (Exhibit A)

58. On June 20th, 2019, Mr. Moon emailed me firing me from his full-time job at the SparkLabs Group.  My salary remains unpaid.

**Underlying Facts – GAN events including the Momentum Tour in 2019**

59. I attended multiple GAN events while I was a mentor and then Venture Partner at SparkLabs, including in 2016 and 2017.  The GAN events I attended in San Francisco in 2017, for example, had over 100 participants not only from GAN member accelerator funds, but many other people participated.

60. The majority of the participants were not Managing Directors or Program Managers of GAN member accelerator funds.

61. I also participated in a GAN event in Colorado in 2018 when I was Managing Director of SparkLabs IoT. Over 100 participants came, the majority of whom were not Managing Directors nor Program Managers of GAN member accelerator funds.

62. At that event, in a quick meeting with Patrick Riley, I suggested to Mr. Riley that GAN should have a fund that invested in the top 5 (or whatever number) accelerator funds each year based on actual results. I also suggested a convertible debt fund for the top GAN accelerator funds and their portfolio companies, to juice their returns further (and provide exposure to those rocketships, with high risk-adjusted returns for investors).

63. Mr. Riley agreed that these were good ideas. I was concerned and didn't want to do anything in conflict (conflict of interest) with the SparkLabs Group, but I informed Mr. Riley that I could help create both funds and raise a significant part of the money for them, possibly, if and when I left SparkLabs.

64. Of course, now that Mr. Riley, Ms. Crough, and GAN have made it clear that they will do everything in their and its power to damage me, blackball me, and prevent me from making money in the community, as per Mr. Moon and SparkLabs threats, obviously those ideas will not be implemented, at least by me. (Perhaps they have already been implemented by GAN)

65. In December 2018, I attended GAN events in Seoul, South Korea, with a much smaller set of participants – perhaps 20 or 25 people were involved. At that point, I was considering leaving the SparkLabs Group due to the securities fraud issues.

66. At those GAN events, I met Mr. Ashish Bhatia and Ms. Mona Singh of India Accelerator. Mr. Bhatia and Ms. Singh requested that I get involved with India Accelerator as a mentor and more, making multiple suggestions for how I could get involved.

10

67. However, at that point, I was concerned that since SparkLabs (already in many other Asian countries) could decide to enter the Indian market, that India Accelerator may be competitive to the SparkLabs Group.

68. I declined the various offers (other than possibly mentorship if the SparkLabs Group did not object), but let Mr. Bhatia and Ms. Singh know that if and when I left the SparkLabs Group, that I would be in touch about the possibility of becoming a partner at India Accelerator or a consultant to India Accelerator.

69. Nevertheless, it is relevant for this complaint that in attending one GAN event (with perhaps one-sixth of the number of normal attendees) after beginning to consider new opportunities, that I had multiple consulting offers, without even seeking such.

70. In Spring 2019, GAN had emailed me about five GAN events (collectively, the Momentum Tour), occurring later in 2019 in Pittsburgh (September 2019 for four days beginning September 9th, 2019); Lima, Peru (beginning September 23rd, 2019); Hamburg, Germany (beginning October 7th, 2019); Manama, Bahrain (beginning October 21st, 2019), and Hong Kong (November 2019).   (Exhibit C)

71. I registered for the last four stops of the Momentum Tour, planning to invest a week at each stop.

72. GAN confirmed my registration for all four days of events at each of those four international stops of the Momentum Tour in Peru, Germany, Bahrain, and Hong Kong.

73. I then blocked out his calendar for those four weeks and purchased plane tickets to the event locations.

74. After receiving Mr. Moon's email that fired me on June 21st, 2019 (sent the day before), I got in touch with Mr. Bhatia and Ms. Singh of the India Accelerator, and they immediately requested that I join the India Accelerator not only as a mentor but in a significant officer role.

75. (I ultimately agreed to contracts with India Accelerator ("IA") in which IA agreed to pay him US $20,000 to draft some investment-related documents, and then to compensate me for a further US $1.1 million for services rendered related to a new India Accelerator fund – US $1.12 million in total compensation).

76. In July 2019 (on July 21st, 2019), I emailed Ms. Lizzie Crough at GAN, letting her know that I was no longer with SparkLabs, and wishing to move my conference registration email from my SparkLabs email to a personal gmail account. (Exhibit B, email chain including July 21st, 2019 email to Ms. Crough).

77. On September 19th, 2019 (just before I was about to fly to Lima, Peru) Ms. Crough emailed me uninviting him from three of the four days in Peru, Germany, Bahrain, and Hong Kong. (Exhibit B).

78. I found Ms. Crough's reason odd:  that only Managing Directors and Program Managers for accelerators were welcome for those three of the four days.

79. The reason I found that odd is that I had attended past GAN events as a mentor, not having such a title.  Further, in all the big multi-day GAN events that I had attended, the majority of the attendees at the events were not Managing Directors or Program Managers at accelerator funds.

80. I believe that Ms. Crough and Mr. Riley, on behalf of GAN, decided to discriminate against the me and disinvite me, and Ms. Crough's lies in her email were there to cover up the real reason for GAN's tortious actions.

81. In doing so, I believe the Defendants potentially violated many state and federal laws, including Title VII of the Civil Rights Act of 1964 (*42 U.S.C. 2000e* and following), and Colorado statutes making it illegal for employers to have unfair or discriminatory practices (such *as CO Rev Stat § 24-34-402 (2016)).*

82. I wonder what particular reason Ms. Crough, Mr. Riley, and GAN decided to discriminate against me.  I'm going to serve discovery to obtain the evidence for the reason the defendants decided to violate my civil rights.  Is it my race, color, religion, sex, gender identity, sexual orientation, national origin, age, perceived disabilities, or perceived genetics?

83. There are dozens of federal and Colorado state laws outlawing discriminatory and unfair practices.  Once I have received back the results of discovery, I will seek to amend my legal complaint with more specifics of which particular federal and state laws the Defendants have violated, as well as the my particular civil rights that were violated.

84. I believe that Mr. Moon and other partners or employees at the SparkLabs Group carried out Mr. Moon's May 2019 threat to blackball me, doing everything they could to ensure that I could not work in venture capital, with accelerator funds, and with startups ever again.

85. I believe that Mr. Riley, Ms. Crough, and GAN conspired with Mr. Moon and other SparkLabs Group partners and representatives to damage me as much as possible, in retaliation (as threatened) for my insistence on cleaning up securities fraud, and for threatening to whistleblow the securities fraud and other felonies committed by Mr. Moon and other SparkLabs partners.

86. I believe that Mr. Riley, Ms. Crough and GAN helped carry out Mr. Moon's threats to blackball me him from the venture and accelerator community, and try to prevent me from making a

living and supporting my children, in violation of Colorado Revised Statutes §§8-2-110 to 8-2-114.

87. I further believe Ms. Crough and Mr. Riley also conspired with Mr. Moon and SparkLabs to retaliate against me for actually whistleblowing the criminal securities fraud I discovered and other felonies committed by SparkLabs Group and its partners (I did report to the SEC, DBO, Attorney General, and County and State law enforcement. In early 2021, I will continue with further reporting to the FBI).

88. In doing so, I believe Ms. Crough and Mr. Riley also violated federal and state laws that prohibit retaliation against whistleblowers. The state-level law that I believe they violated is *Colorado Revised Statutes Section 24-114-102.*

89. For whatever reason Mr. Riley and Ms. Crough decided to try to hurt and damage the Plaintiff with their tortious acts, my understanding is that GAN itself is legally responsible.

90. The resulting damages to me are quite significant.

91. I believe if we get to a jury trial in 2022 or 2023, that I will prove damages in the millions and will be awarded a judgment in at least 7 digits.

92. On the smaller side, I'm out thousands of dollars I invested in plane tickets to travel internationally to the GAN events he had been accepted to, as well as some of my time.

93. The time commitment unfortunately will continue for years to come as I seek justice in the Courts. I'm going to invest even more time to litigate to prevent the Defendants from hurting others, and to get a judgment for the damages that Defendants have caused me.

94. The much larger financial damages come in the form of my lost revenue and income.

95. I have extremely valuable skills and experiences, which ironically are most valuable to the best accelerators. GAN has done an excellent job of forming this community of the top accelerators and having them pay as members.

96. I have been an entrepreneur with multiple exits. I've helped grow dozens of rocket-ship startups. I've started companies in 14 different countries and I've launched products and marketed and sold them all over the world.

97. I've raised, with my teams, over US $550 million of capital.

98. I'm quite confident I would have signed up multiple GAN accelerator funds as clients at the scheduled events and likely would already have raised millions of dollars for them, and potentially tens of millions.

99. That would have been good for me, for those accelerators, for their portfolio companies, and for GAN itself.

100.    I have further valuable skills for this community, having been involved with over 16 different accelerators over nearly a decade, including the SparkLabs Group.

101.    The SparkLabs Group has incredible investment returns (despite the rampant criminal securities fraud). I knows how to run an extremely successful accelerator fund (without the securities fraud and other felonies).

102.    Since I booked over US $1.1 million of compensation from attending one small set of events with one-sixth of the normal attendings, without even seeking opportunity, I'm quite confident that I would have signed up multiple consulting clients from attending the twelve days of events I was disinvited to.

15

103.    I may have become a partner at another GAN accelerator fund, and/or could very well have earned millions in consulting compensation, but for the tortious acts, non-acts, and negligence of the Defendants.

104.    I'm doing what I can to mitigate damages.  I've had to focus on survival, given that SparkLabs owes me hundreds of thousands of dollars in unpaid salary and more, but I expect shortly to be able to invest more time in marketing myself to those people and entities for whom my unique skills could be most valuable.

105.    In parallel, to right the scales of justice, I have been forced to litigate to get to a jury trial where I will prove the culpability of the defendants as well as the corresponding damages. Hopefully we can settle these issues, but if not, we'll all be investing significant time and other resources in this process for the next two years or more.


FURTHER AFFIANT SAYETH NAUGHT.


Friday, December 18th, 2020

CARL A. WESCOTT

EXHIBIT B

**carlwescott42@gmail.com**

| | |
|---|---|
| **From:** | Lizzie Crough <lizzie@gan.co> |
| **Sent:** | Friday, September 20, 2019 9:12 AM |
| **To:** | Carl Wescott |
| **Subject:** | Re: GAN Momentum Tour, SparkLabs -> IA, GGV, etc. |

Great, thanks Carl! I'm really looking forward to seeing you! I also just sent Patrick a quick note w/heads up about your email to him as well. As I'm sure you can imagine, he's been super busy this week as he's prepping to head out on the tour with his family in tow :)

See you next week!



**Lizzie Crough**
Community Manager
GAN — *Where no startup stands alone.*

Connect with GAN Accelerators
Skype: Lizzie.Crough
Mobile: +1-415-595-9951

Join us on the 2019 GAN Momentum Tour.
Sign up for our weekly newsletter.
Twitter | Facebook | LinkedIn | Medium | YouTube

On Thu, Sep 19, 2019 at 6:29 PM Carl Wescott <carlwescott42@gmail.com> wrote:
Lizzie,

The part that helps is that there is clarity.  :-)

Carl

On Thu, 19 Sep 2019 at 14:24, Lizzie Crough <lizzie@gan.co> wrote:
Hi Carl! Super sorry again for the delay here!

First off, we're so excited you're traveling to Lima! We would love to have you join us for the community happy hour on Sept 25th and Momentum Day on Sept 26th.

With this and the other stops, however, the first three days of our gatherings (in Lima, Hamburg, Manama and also Hong Kong) are designed for GAN Accelerator Managing Directors and Program Managers and because you're not currently in one of those critical roles for a GAN Accelerator program, unfortunately, they are closed. Our intention is to focus those three days on the operational challenges that accelerator operators face and we want to keep that group as curated as possible. But with that being said it sounds like you're in a transition and will be working closely with India Accelerator and soon other GAN Accelerators (currently GGV isn't officially part of our

community) and we would absolutely LOVE to have you there for the happy hour (AKA THE GAN PARTY!!) and day 4.

Here is where you can find information about all upcoming cities community events (this is the public registration for the Thursday event will repeat in each city) In terms of Lima, we would love you to be there Weds for the happy hour and also Thursday to engage with more founders form the GAN Community - and of course the same for the other cities!

Will you let me know if this helps at all? I also arrive in Peru on Sunday and will be so happy to know we're in the same town! :)



**Lizzie Crough**
Community Manager
GAN — *Where no startup stands alone.*

Connect with GAN Accelerators
Skype: Lizzie.Crough

Mobile: +1-415-595-9951

Join us on the 2019 GAN Momentum Tour.
Sign up for our weekly newsletter.
Twitter | Facebook | LinkedIn | Medium | YouTube

On Thu, Sep 19, 2019 at 10:17 AM Carl Wescott <carlwescott42@gmail.com> wrote:
OK great!

On Thu, 19 Sep 2019 at 09:15, Lizzie Crough <lizzie@gan.co> wrote:
Hi Carl! I'm so sorry, it's Denver Startup Week this week and we've been all over the place - I'm sure just like a typical day for you! I wanted to let you know I'll get back ASAP when I'm back in the office in a bit.



**Lizzie Crough**
Community Manager
GAN — *Where no startup stands alone.*

Connect with GAN Accelerators
Skype: Lizzie.Crough

Mobile: +1-415-595-9951

Join us on the 2019 GAN Momentum Tour.
Sign up for our weekly newsletter.
Twitter | Facebook | LinkedIn | Medium | YouTube

On Wed, Sep 18, 2019 at 5:01 PM Carl Wescott <carlwescott42@gmail.com> wrote:
Hi Lizzie,

Following up on this... I registered as a SparkLabs partner for the remaining four:  Lima, Hamburg, Manama, and Hong Kong, and purchased some flights.

Now my Monday is freeing up so I can come to Lima next week.

I already have a flight arriving Sunday pm to LIM that luckily I didn't cancel.

Is it possible to move my registration from carl@sparklabsiot.com to carlwescott42@gmail.com?

If it helps I am now an India Accelerator mentor, am a mentor at other GAN accelerators (Golden Gate Ventures is a GAN member yes?), and may be a partner at IA soon (and other ones).

--Carl


On Sun, 21 Jul 2019 at 16:18, Carl Wescott <carlwescott42@gmail.com> wrote:

Lizzie, hope you're well.   I'm leaving SparkLabs but am already registered for the GAN momentum tour, with plane tickets purchased.

Let's talk soon... but FYI I still hope to come to a few of them or possibly more.  I also wish to move registration to carlwescott42@gmail.com since I won't be using my SparkLabs IoT email moving forward.

Are you attending some or all of them?

—Carl +1 415 335 5000

Telepathically sent to Siri who hopefully got it right.

3

**carlwescott42@gmail.com**

| | |
|---|---|
| **From:** | Lizzie Crough <lizzie@gan.co> |
| **Sent:** | Thursday, September 19, 2019 2:24 PM |
| **To:** | Carl Wescott |
| **Subject:** | Re: GAN Momentum Tour, SparkLabs -> IA, GGV, etc. |

Hi Carl! Super sorry again for the delay here!

First off, we're so excited you're traveling to Lima! We would love to have you join us for the community happy hour on Sept 25th and Momentum Day on Sept 26th.

With this and the other stops, however, the first three days of our gatherings (in Lima, Hamburg, Manama and also Hong Kong) are designed for GAN Accelerator Managing Directors and Program Managers and because you're not currently in one of those critical roles for a GAN Accelerator program, unfortunately, they are closed. Our intention is to focus those three days on the operational challenges that accelerator operators face and we want to keep that group as curated as possible. But with that being said it sounds like you're in a transition and will be working closely with India Accelerator and soon other GAN Accelerators (currently GGV isn't officially part of our community) and we would absolutely LOVE to have you there for the happy hour (AKA THE GAN PARTY!!) and day 4.

Here is where you can find information about all upcoming cities community events (this is the public registration for the Thursday event will repeat in each city) In terms of Lima, we would love you to be there Weds for the happy hour and also Thursday to engage with more founders form the GAN Community - and of course the same for the other cities!

Will you let me know if this helps at all? I also arrive in Peru on Sunday and will be so happy to know we're in the same town! :)



**Lizzie Crough**
Community Manager
GAN — *Where no startup stands alone.*

Connect with GAN Accelerators
Skype: Lizzie.Crough

Mobile: +1-415-595-9951

Join us on the 2019 GAN Momentum Tour.
Sign up for our weekly newsletter.
Twitter | Facebook | LinkedIn | Medium | YouTube

On Thu, Sep 19, 2019 at 10:17 AM Carl Wescott <carlwescott42@gmail.com> wrote:
> OK great!

On Thu, 19 Sep 2019 at 09:15, Lizzie Crough <lizzie@gan.co> wrote:

1

Hi Carl! I'm so sorry, it's Denver Startup Week this week and we've been all over the place - I'm sure just like a typical day for you! I wanted to let you know I'll get back ASAP when I'm back in the office in a bit.



**Lizzie Crough**
Community Manager
GAN — *Where no startup stands alone.*

Connect with GAN Accelerators
Skype: Lizzie.Crough
Mobile: +1-415-595-9951

Join us on the 2019 GAN Momentum Tour.
Sign up for our weekly newsletter.
Twitter | Facebook | LinkedIn | Medium | YouTube

On Wed, Sep 18, 2019 at 5:01 PM Carl Wescott <carlwescott42@gmail.com> wrote:
Hi Lizzie,

Following up on this... I registered as a SparkLabs partner for the remaining four: Lima, Hamburg, Manama, and Hong Kong, and purchased some flights.

Now my Monday is freeing up so I can come to Lima next week.

I already have a flight arriving Sunday pm to LIM that luckily I didn't cancel.

Is it possible to move my registration from carl@sparklabsiot.com to carlwescott42@gmail.com?

If it helps I am now an India Accelerator mentor, am a mentor at other GAN accelerators (Golden Gate Ventures is a GAN member yes?), and may be a partner at IA soon (and other ones).

--Carl

On Sun, 21 Jul 2019 at 16:18, Carl Wescott <carlwescott42@gmail.com> wrote:
Lizzie, hope you're well. I'm leaving SparkLabs but am already registered for the GAN momentum tour, with plane tickets purchased.

Let's talk soon... but FYI I still hope to come to a few of them or possibly more. I also wish to move registration to carlwescott42@gmail.com since I won't be using my SparkLabs IoT email moving forward.

Are you attending some or all of them?

—Carl +1 415 335 5000

Telepathically sent to Siri who hopefully got it right.

2

12/17/2020    Here We Come, World — GAN. I can't remember the last time I was... | by Patrick Riley | GAN Community | Medium



This is your **last** free member-only story this month. Sign up for Medium and get an extra one



# Here We Come, World — GAN


Patrick Riley
Sep 4, 2019 · 3 min read ★

I can't remember the last time I was this excited. In just four days, GAN hits the road on our 2019 GAN Momentum Tour, a five-stop global tour focused on helping startups get and sustain momentum wherever they call home. But even if you can't personally join us on any of the five stops, I still think we all have huge reasons to be excited about what lies behind this tour-

**There Are Startups — *Everywhere***

On the tour, we'll be in Pittsburgh, Lima, Hamburg, Manama, and Hong Kong. Our intent when planning the tour was to host each stop in "everywhere else" cities-places that aren't "typical" startup hubs like New York City or Berlin. Instead, we wanted to find cities that might be under your radar but are thriving nonetheless. Cities with startup scenes full of hustlers. Startups who are making it work outside of the largest cities in the world.

And guess what? At each stop, there are, indeed, startups already present and doing incredibly well, thanks to local accelerators and all of the other support ecosystems

that exist in each region. There will be anywhere between 50 to more than 100 startups showing up at each stop who will get the chance to meet with corporate partners, investors, economic development representatives, and their startup peers.

In other words, there are already hundreds-if not thousands-of startups already in each of these cities. And that's really good news. Why?

**Those Startups Are Building Building Incredible Stuff —** *Everywhere*
When we look at who's actually coming to the Momentum Tour, it's an incredible set of founders building powerful businesses. Attendees already include startups reimagining how the public ships packages back to stores, startups changing how daycare facilities interact with parents, and startups helping commercial kitchens save a ton of money on repair costs.

They're all startups who have found amazing niches and are building them in all corners of the world.

**Startups are Actually Thriving —** *Everywhere*
The best part about these startups is that they're actually thriving and building sustainable companies everywhere. On average, any GAN Startup attending the event has raised $547K in the 12 months after leaving their accelerator and $320K in annual revenue, and they've hired *seven people.*

**Startups Want to Stay —** *Everywhere*
But, what I love the most about all of this is that, even as these companies grow and thrive, they're not looking to move into a bigger city. They're not seeking "greener pastures" when things go well. They actually want to stay where they are.

That's exactly what we're seeing from articles like this.

Startups want to stay and grow wherever they are. Why? Because they're actually getting capital, revenue, and quality staff in these places.

**We Need Startups —** *Everywhere*
That, frankly, is the reason we're doing this tour. To help the startup that is everywhere actually *stay* everywhere. To help them avoid the need to move if staying is what works best for them. To avoid having to uproot their families and friendships all because they think they need to move to a larger or better city.

If we believe that having more startups in our communities is good for our local cultures-that they're creating jobs and that they're providing valuable products that make all of our lives better- then I hope you join me in getting as excited as I am about this tour.

Because it's a celebration of the startups who have built-and continue to build-everywhere. And because it's a tour focused on helping those startups get even more momentum than they already have.

I can't wait to see you on the road.

*Originally published at [https://www.gan.co](https://www.gan.co) on September 4, 2019.*

Startup

About  Help  Legal

  

12/17/2020                                              GAN Momentum Tour 2019 - GAN



GAN Community: Momentum Tour

# GAN Momentum Tour 2019

WHO

**The Entire GAN Community**

WHERE

**Global**

DATE & TIME

**Sep 9th, 2019** | Pittsburgh
**Sep 23rd, 2019** | Lima
**Oct 7th, 2019** | Hamburg
**Oct 21st, 2019** | Manama

COST

**N/A**

**Questions:** hello@gan.co

REGISTER NOW

This year, we're coming to you.

This year, the GAN Summit you know and love is coming to you and we're calling it
the GAN Momentum Tour. Why? Because later this year, we'll gather you—our
accelerator community—in four cities across the world for a week at each stop. As
always, you'll get to connect with your accelerator peers. But, for one day at each
stop, we'll bring together the entire GAN Community—accelerators, corporate
partners, investors, and startups—alongside others from the region to showcase
you and discuss ways to help startups gain momentum in that region.

Space will truly be limited—especially for the first few days, with just accelerators—
so register as soon as possible to reserve your spot. But you're also welcome to
join us at more than one stop.

## Locations

Here's where we're headed, when, and the incredible GAN Accelerators hosting
each stop.

1. **Pittsburgh,
   Pennsylvania, USA:**
   September 9th-12th
   Hosted By:
   AlphaLab & AlphaLab Gear

2. **Lima, Peru** *(Momentum Day only):*
   September 24th-26th
   Hosted By:
   UTEC Ventures

3. **Hamburg, Germany:**
   October 7th-10th
   Hosted By:
   next media accelerator

12/17/2020                                GAN Momentum Tour 2019 - GAN

4    **Manama, Bahrain:**
October 21st-24th
Hosted By:
Flat6Labs Bahrain, Seed Fuel–Rowad, and Nest Bahrain

# Schedule

At each stop, we'll follow this basic schedule:

**Days 1-3 (Mon-Wed):**
*GAN Accelerator Regional Gathering*
The week will kick off with a private, three-day accelerator-only offsite summit, capped off by an informal happy hour on Wednesday evening. **Who's Invited:** Accelerators in the GAN Community.

**Day 4 (Thursday):**
*Momentum Day*
On the fourth day, we'll bring together the entire GAN Community—accelerators, corporate partners, investors, and startups—alongside others from the region. We'll showcase you, GAN Accelerators, and will discuss ways to help startups gain momentum in the region. **Who's Invited:** GAN Accelerators, GAN Partners, GAN Startups (alumni of GAN Accelerators), investors, and additional startups in the region who are looking to join a GAN Accelerator.

# The Details

**Pittsburgh, PA, USA**
**Venue and lodging:** Seven Springs Resort ($149/night; book before August 9)
To book: Call Seven Springs at 866-437-1300 and reference "GAN Momentum Tour"
Transportation: On your own
Programming begins at 2:00 p.m. Monday and concludes at 1:30 p.m. Wednesday, followed by happy hour and Momentum Day in Pittsburgh.

**Hamburg, Germany**
**Venue and lodging:** Bretterbude (room rate has expired; please reach out to the venue for the most up-to-date rates)
To book: Fill out this form and return to the included email address (we recommend including breakfast in your reservation request).

Transportation: Details to be provided
Programming begins at 14:00 Monday and concludes at 13:30 Wednesday, followed by happy hour and Momentum Day in Hamburg.

**Manama, Bahrain**
**Venue and lodging:** Art Rotana (BHD 65.40/night; book before 11 October)
To book: Fill out this form and return to the included email address
Transportation: On your own
Programming begins at 14:00 Monday and concludes at 13:30 Wednesday, followed by happy hour and Momentum Day in Manama.

## To Register

Again, space will be limited, so register as soon as possible and let us know all of the stops you'd like to attend. You can attend as many locations as you would like as long as there is space available. Additional details, including travel and transportation information and a more detailed schedule, will continue to be updated here as we have it.

Use password **"GANconnect"** to view the registration page on Eventbrite when you click below.

**Please Note:** *This page is for GAN Accelerators only. Separate details will be sent out to other invited parties in the near future, along with location-specific details. For now, please do not share this page.*

## Register Now >



**carlwescott42@gmail.com**                    EXHIBIT D

| | |
|---|---|
| **From:** | Lizzie Cough <lizzie@gan.co> |
| **Sent:** | Friday, September 20, 2019 5:32 PM |
| **To:** | Carl Wescott |
| **Subject:** | Re: GAN Momentum: Bahrain and HK |

Hi Carl, I'm sorry, I just picked up my kids and needed a minute to reply- I want you to know how sorry I am for any confusion- we've had to unfortunately have the same conversation with other accelerators. It is certainly not any intention of ours to exclude, and in fact the gathering in Lima had to take on a different format due to some scheduling difficulties with our community so that has changed entirely anyway, and since your affiliation change in the middle of all this, we have to be upfront as we have said the same to others, and need to keep things the same across the board. We honestly want to see you at the other main weds/thurs events and hope you will still join.

I hope you will still be at momentum day next week and also at the others- those are meant to be super meaningful and the main event at each stop.

I talked with Pat and he's going to follow up with you next week unless of course you are there in person and you guys can connect then?

Thank Carl- truly, I feel horrible for any problems or confusion I may have cause on my part.


> On Sep 20, 2019, at 4:37 PM, Carl Wescott <carlwescott42@gmail.com> wrote:
>
> Lizzie, I just called United and cancelled Hamburg etc.  It's unfortunate that I've wasted resources including valuable time in all of this, but I understand that you have to enforce GAN policies.
>
> These *are* GAN policies, aren't they?
>
> On a personal note, the two legs I was most looking forward to were Bahrain and HK.
>
> I'm hoping to find a way that I can participate in those two.
>
> I may be in the right position in a GAN accelerator within that time, to follow the new GAN policy.
>
> Let me just double-confirm with you, since you already confirmed with me in writing about the requirement.
>
> Every single person participating in Lima in the first 3 days is a Managing Director or Program Manager of a GAN accelerator, correct?
>
> Every single person participating in Hamburg in the first 3 days is a Managing Director or Program Manager of a GAN accelerator, correct?
>
> It's strange because when I first attended a GAN event I was only a SparkLabs mentor, and then in the next couple or more, I was a Venture Partner.
>
> In any case, those two that I've been disinvited from I have now cancelled arrangements for.
>

1

> I may very well be a Managing Director of a GAN accelerator by then... but if I have a different role at a GAN accelerator (I don't see myself being a Program Manager, sorry :), might it be possible to participate in Manama and/or HK?
>
> Or even if I don't yet have a Managing Director role?  I don't think I will ever have that role, come to think of it.  That's more responsibility than I want to have.
>
> I'm already a mentor at multiple GAN accelerators.  That appeared to be good enough before.
>
> I've been asked to be a Fund Manager at a GAN accelerator (but have not accepted).  Do any investors or consultants or fund managers participate.
>
> I'd like to participate in Manama (I'll be in Dubai the week before judging a pitch competition anyways).
>
> I'd also like to participate in Hong Kong if that's possible.
>
> Let's strategize on how we might make this work, if we can.
>
> Thanks for your time and consideration... hoping we can continue to collaborate and do great things for years to come!
>
> --Carl +1 415 335 5000
>
> PS In order to follow state (including California and Colorado) and federal laws I suggest you disinvite every other person for Lima, Hamburg, Manama and Hong Kong who is not a Managing Director or Program Manager of a GAN accelerator..